The first fifteen paragraphs of the last will and testament of Emerson McMillin, deceased, are devoted to pecuniary legacies to relatives. This litigation involves the true meaning of the following sections:
"Sixteenth. My direct heirs at law, members of my family, and residuary legatees of the Estate Trusteed in Section Seventeen, and all of whom are to be equal, in every respect, as to his or her interest in the Trusteed Estate, are: my wife, Isabel Morgan McMillin, now of Darlington, Mahway, New Jersey, my daughters, Mary McMillin Norton, wife of Oliver D. Norton, now of Santa Barbara, California; Estelle McMillin Traverso, wife of Ubaldo Traverso, now of Florence, Italy; Maude McMillin [unmarried] of Darlington, Mahway, New Jersey; my son, Marion McMillin, of Darlington, Mahway, New Jersey; and my granddaughter, Helen Isabel McMillin [only child of my deceased son, Emerson McMillin, Jr.], now of Darlington, Mahway, New Jersey. For all the persons named, I have previously made ample provision for their own welfare as well as for the welfare of those depending upon them. My granddaughter, Helen Isabel, the only child of my deceased son, Emerson, inherited liberal sums from her father and from her mother. To the above named direct heirs, residuary legatees, and designated members of my family, I express my earnest desire that the Darlington Estate shall remain intact in the family, and I stipulate that this must be so during the life of my wife, Isabel Morgan McMillin.
"Seventeenth. I give devise and bequeath unto my Trustees to be hereinafter named, and their successors, in trust, however, for the persons named in Section Sixteen, all the residue of my Estate, including leases of my summer home at Beaver Island, Upper Dam, Oxford County, Maine; the eighty-six acre plot of land known as the Marion Cottage property of Mohegan Lake, West Chester County, New York; Apartment House at 320 West 86th Street, New York City, New York; and my Darlington Estate, Mahway, New Jersey; and all the farm equipments, produce, live stock and household furniture, paintings, tapestries, textile fabrics, porcelains, potteries, bronzes and art objects of every kind and character; and all the stocks, bonds, notes, cash, credits and assets of any kind and of which I may die possessed, and not herein before disposed of, but with the following conditions and stipulations: [a] The Beaver *Page 516 
Island leases, the Marion Cottage property and the City Apartment House in New York, are all to be sold as soon as may be, and the proceeds to be invested as the Trustees shall deem to the best interests of the estate. [b] The household furniture, libraries and camp equipment at Beaver Island, including steam boat — to be disposed of — if convenient with the leases. The proceeds of all sales shall be invested by the Trustees for the Trust Estate. The Trustees shall permit the Darlington Estate with all its comprehends to be used free of all rent and with absolute control by the family, with power, through my son, Marion, or other chosen head of the family, to operate the Farm, to purchase machinery and supplies, to buy and sell farm products, including live stock of all kinds, but not to convey real estate, nor to sell any objects of art or household furniture except with the approval of the Trustees.
"Eighteenth. All income from rents, dividends on stocks, interest on bonds or other securities not herein otherwise disposed of, in fact, all income of every kind and character, except the income of the Darlington Estate during its retention by the family, shall be paid to and received by the Trustees for the benefit of the Trust Estate, and the Trustees are empowered to sell, dispose of, convey and give title to any kind of property, real or personal, at any and all times, when deemed advisable by them, except as to the disposition and sale of the Darlington Estate during the life of my wife.
"Nineteenth. From the income of the Trust Estate the Trustees shall [a] pay to my wife, Isabel Morgan McMillin, and to my son, Marion McMillin, jointly, the sum of fifty thousand dollars per year, payable quarterly for the maintenance of the family at Darlington and the upkeep and improvement of the Darlington Estate. In the event that my wife shall predecease me, then the fifty thousand dollars shall be paid to my son alone, for the purpose above mentioned. If the family desire to retain Darlington after the decease of both my wife and my son, they shall designate a head of the family in a manner that shall be satisfactory to the Trustees, and the person so designated shall receive and disburse the Darlington Estate Annuity. Should any of the persons named as my direct heirs and members of my family prefer not to make their home at Darlington, then such person or persons shall each receive twenty-five hundred dollars per year, in quarterly payments, to be taken by the Trustees from the Darlington Estate fund of fifty thousand dollars per year herein above provided for.
"Twentieth. From the income of the Trust Estate, after deducting the provisions of Section Nineteen, the Trustees shall pay to each of my direct heirs [and persons designated as member of the family and legatees of the Trust Estate], that is to say — pay to Isabel Morgan McMillin, my wife, to Mary McMillin Norton, to Estelle McMillin Traverse, to Maud McMillin, to Marion McMillin and to Helen Isabel McMillin, or in the event of the decease of any of the above named members of the family, then to the heirs or to the devisee of such member, the sum of fifty thousand dollars per year, payable quarterly. In the event of the Trust Estate not producing in any year an income sufficient, together with any accumulated *Page 517 
income from previous years — to pay fifty thousand dollars for the maintenance of the family and the upkeep of the Darlington Estate, and fifty thousand dollars to each beneficiary named in this section, then the sum of annual payments to the Darlington fund and to each individual named shall be reduced pro rata. On the other hand, the Trustees may increase the several annual payments pro rata, whenever — in their judgment — the excess of annual income, or excess of accumulations shall warrant such increase. The matter of increase of payments to be wholly discretionary with the Trustees. It is not the intent of the testator that the Trustees shall strive to increase the total value of the Estate; but that they shall be liberal in their distribution. The Trustees may pay any part, or all of the annuities, in stocks, bonds or other securities instead of cash, if for any reason they, the Trustees, shall deem it advisable so to do.
"Twenty-first. Upon the decease of both my wife and my son, the Trust shall, except as hereinafter provided, cease and determine, through the Trustees disposing by sale of all the undivisable property [excepting only my Mausoleum in Woodland Cemetery in the City of New York, which Mausoleum is to be and remain the property of my family, as designated in Section Sixteen of this instrument, and to their heirs, and to be used for the purpose for which it was constructed]; and [after paying the cost of administration] by making an equal division of all the assets between the persons named [in Section Sixteen] as direct heirs and members of the family and who are named as residuary legatees, if then living, share and share alike, or to their heir or heirs or to the devisee of any deceased member or members. Provided, however, that so long as a majority in number of the surviving members of the family [as named in Section Sixteen] so desire the Trust shall be continued.
"Twenty-second. After the decease of my wife and before the decease of my son, if such be the order of their decease, the Darlington home may be disposed of by sale, if two Trustees shall — for financial reasons — deem it advisable. Or if a majority of the remaining or surviving direct heirs and members of the family shall formally request the Trustees to dispose by sale of the said Darlington Estate, it shall be disposed of accordingly, and the annual payment for its maintenance shall cease. Upon the sale and disposition of the Darlington Estate, from, or for, whatever reason, it shall be the duty of the Trustees to promptly divide up the divisable assets, sell the remainder and divide equally all the assets between the residuary legatees, share and share alike, or, if any be deceased, then to their heirs or devisees."
The testator died May 31st, 1922. All the beneficiaries mentioned in the sixteenth paragraph survived him. His widow died October 5th, 1922, testate, leaving the residue of her estate to her two daughters, Estelle McMillin Traverso and Maude McMillin, and her son, Marion McMillin, each a fourth, and to trustees, for the use of two grandchildren *Page 518 
and a step-grandchild, the remaining fourth. Her heirs-at-law were her two daughters, her son, and a granddaughter, Helen Isabel McMillin, daughter of a deceased son, Emerson McMillin, Jr. Marion McMillin died January 5th, 1924, without issue and intestate, leaving a widow, Jane M. McMillin, his administratrix. The trust was terminated on the death of Marion. The real estate has been sold and the estate is ready for distribution. The trustees seeks the guidance of the court as to the disposition to be made of the shares given to the widow and Marion, and propound these questions: Was the gift to the widow vested absolutely and is it payable to her executors, or is it payable to her heirs-at-law or next of kin, or to the residuary legatees under her will? And as to the gift to the son, Marion, deceased, Was it vested absolutely and is it payable to his administratrix, or is it payable to his heirs-at-law or next of kin? The further question is, Are the proceeds of the sales of lands to be treated as realty or personalty?
The testator evidently drew his own will, embodying a comprehensive and well-rounded scheme of testamentary disposition, and no doubt felt he had set down his wishes in such plain fashion that there could be no two notions as to its meanings. And were it not for the inept use of technical terms, of which, it seems, he had a conversational familiarity, much confusion would have been spared. The will is evidently the product of a straight-thinking mind of unequivocal purpose, and whatever may be the primary legal import of the variety of expressions used, the testator's meaning is not obscure from the lay viewpoint, nor from the judicial standpoint, if we apply the rules of construction to the development of his intention rather than try to square the will with the rules. The cardinal rule is the real intention of the testator in whatever form it finds expression.
The testator died possessed of a large fortune and "Darlington," his homestead of many hundred acres. His all-engrossing thought was to leave his estate (except pecuniary legacies to his relatives) to the six members of his family, in equal shares, and gave emphasis to this in the keynote section *Page 519 
(sixteen), wherein he described them by name and as the "residuary legatee of the estate trusteed in section seventeen, and all of whom are to be equal, in every respect, as to his or her interest in the trusteed estate." Each was to have a vested undivided sixth in his or her own right.
The estate was given, in language of express and immediate gift, to the trustees "for the persons named in section sixteen," and in equity the gift is deemed to be to the cestui que trust
as though it had been made directly to them. Neilson v.Bishop, 45 N.J. Eq. 473; Miller v. Worrall, 59 N.J. Eq. 134.
The postponement of the enjoyment of the corpus was not because of anything personal to the legatees. The intervention of the legal estate in the trustees was merely for the convenience of the estate, i.e., for more advantagously handling the interest pending the trust, and the legacies vested at the death of the testator. Post v. Herbert, 27 N.J. Eq. 540. And upon the death of a legatee it vested in the substituted donee in his or her stead. Crane v. Bolle, 49 N.J. Eq. 373. The gift of the income in equal shares to the legatees until they should come into the principal in equal shares also marks the vesting of the estate. Dusenberry v. Johnson, 59 N.J. Eq. 336; Fidelity-UnionTrust Co. v. Rowland, 99 N.J. Eq. 72. Another strong indication that the estate vested is the gift of an undivided sixth interest to the widow, though the testator knew she could not live to come into possession of the corpus. She would have been let in but for the trust for the maintenance of "Darlington," or had the trust been destructible in her lifetime.
Having first secured his estate to the six members of his family the testator planned to continue the home, in all its splendor, for their use, at least, during his widow's remaining years, and to provide for their maintenance in keeping with their ultimate inheritance. By the variable gifts for the upkeep of "Darlington" and to the members of his family during the period of the trust, he, in effect, appropriated the entire income to their use.
The testator's idea was that the division of the corpus
should be in liquid assets, and to that end directed that all *Page 520 
his real estate be sold for the purpose of distribution, and under well-recognized principles the proceeds are deemed to be personal property. Cook's Executors v. Cook's Administrators,20 N.J. Eq. 375; Baldwin v. Taylor, 37 N.J. Eq. 78.
Upon the termination of the trust, after the death of the widow, the trustees were directed to pay over the residuary estate "by making an equal division of all the assets between the persons named [in section sixteen] as direct heirs and members of the family and who are named as residuary legatees, if then living, share and share alike, or to their heir or heirs, or to the devisees of any deceased member or members." Here the testator dealt with the distribution of the corpus, not with the substance of the gift. The members of his family "if then living" (at the distribution) were to receive their shares, and deceased members' shares were transmitted by way of substitution to their "heirs or devisees." The payment to them and not the gift of the shares was upon condition that they survive the period of the trust. Security Trust Co. v. Lovett, 78 N.J. Eq. 445.
The testator's widow, obviously, could not, and his son, Marion, did not, live to come into the enjoyment of the corpus, and their shares, consequently, devolve upon those who would take as "devisees" under their last wills and testaments, or, in default of a will, to their "heirs" by operation of law, as though they had died possessed. The testator intended, and it is clear, that the shares to the members of his family, who could not, or would not, come into possession, should pass to those who would inherit from them. He conceived that "devisees" supplanted "heirs," and meant that the devisees should take to the exclusion of heirs, if there was a will, if not, the heirs were to take, not, as has been argued, that it was given without choice to either the one class or the other. This applies also to the income given to the heirs or devisees of a deceased legatee, consistent with the testator's intention that the share of each member of his family in the residuary estate should be equal to the share of the others.
The subject-matter of the gift being personal property, the word "devisees" is referable to "legatees" and "heirs" *Page 521 
to those who take under the statute of distribution. The word "heirs," when applied to the disposition of personal property, has been uniformly held in this state to indicate distributees under the statute. In Leavitt v. Dunn, 56 N.J. Law 309, an insurance policy payable to the "heirs" of the insured was held by the court of errors and appeals to include the widow. InMeeker v. Forbes, 84 N.J. Eq. 271; affirmed, 86 N.J. Eq. 255,
Vice-Chancellor Stevens held that a substitutionary gift of personal property to the "heirs-at-law" of a legatee who died before distribution without issue passed to his widow, and the ruling is dispositive of the claim of Marion's widow.
The doctrine of these authorities is not criticised, but it is contended that the word "heirs" was used in the sense of issue. This is based on the testator's supposed love of kin or "pride of blood," and is said to be indicated in other parts of the will. The fact that he gave the share of his widow to her "devisees" without restriction as to kinship is a forceful denial. It is, however, pointed out that by the fourth section of the will a pecuniary legacy was given to the grandchildren of the testator's sister Eliza J. Ewing, children of her son and daughter, and "in the event that any of the said grandchildren predecease me leaving issue, such issue shall be the beneficiaries;" and by sections 5 to 10 pecuniary legacies are given to the children (or their heirs) of his remaining brothers and sisters, and that by the eleventh section it is provided that "gifts to the children [or their heirs] means to the direct issue of my brothers' or sisters' children, and not to issue beyond the second generation, or to others who, by adoption or otherwise, might be heirs-at-law, except in the case of my sister Eliza, where it is her grandchildren and not her children who are made the beneficiaries. In that case her great-grandchildren who do no not predecease me shall be the beneficiaries," and it is argued from this that the testator thereby indicated an intention that his estate should not go to strangers — to Marion's widow, and to the step-grandchild under the will of the testator's widow. It is, undoubtedly, the rule that the same words in different parts *Page 522 
of a will, used to express a common purpose, are presumed to have been used in the same sense — 2 Jarm. (5th ed.) 773 — but it is difficult to see how the application of the rule is helpful. By the eleventh section the testator simply meant to limit the representation, not to restrict the gift to his kin. By "direct issue" he referred to immediate issue, to the children of the primary legatees — the second generation; and this he clarified by excepting the case of his sister Eliza "where it is her grandchildren and not her children who are made the beneficiaries." Cases in this state, cited as holding the word "heirs" to mean issue, will be found, upon examination, were decided upon peculiar circumstances calling for that meaning.Bruere v. Bruere, 35 N.J. Eq. 432; Baldwin v. Taylor, supra;Randolph v. Randolph, 40 N.J. Eq. 73; Dawson v. Schaefer,52 N.J. Eq. 341; Dean v. Nutley, 70 N.J. Law 217; In re Smisson,79 N.J. Eq. 233. The claim of Jacob Schaab as an "heir" of his widow's personal estate was not considered, as it was not in the later case involving the same estate. Cranstoun v. Westendorf,91 N.J. Eq. 34.
The insistence that the alternative gift to the "devisees" of a deceased member of testator's family conferred only a power of appointment, and that the power was not exercised by the testator's widow, is without merit. Farnum v. Pa. Co., 87 N.J. Eq. 108; affirmed, Ibid. 652, is cited. The gift over does not rest on the exercise of a delegated authority to the widow to select the donees. The widow had the power to create, not to appoint the substitutes. The executory bequest defines the donees who take by the limitation over as those who answer the description of "heirs" or "devisees" of a deceased legatee. The bequests are self-executing to their devisees if there is a will, to their "heirs" if there is not. The gifts to them are effected by the testator's will, not by the legatee's direction.
The contention that the gift of the residue to the six members of the testator's family was to them as a class, and that Marion's share, he having died without issue, fell into the residue and is divisible among the survivors of the class, ignors the distinguishing features of the bequest, that it is *Page 523 
to the legatees severally by name and the distribution of the undivided residue among them in equal shares. Dildine v.Dildine, 32 N.J. Eq. 78.
The contention that the vested estate of the widow was not divested by her death before the period of distribution, because the gift over is void for uncertainty in that it is given indefinitely to her heirs or devisees (11 R.C.L. 484;Dusenberry v. Johnson, supra), presents a purely academic question. The legatees under the widow's will and the widow of Marion under the statute of distribution (Comp. Stat. p. 2629) take whether the limitation over be good or bad, and the executors are advised to pay the respective shares to them.