The bill in this cause is filed by complainant as trustee under the last will and testament of Edward H. Stokes, deceased, asking judicial interpretation of certain provisions of the will and for instructions as to its duty thereunder.
The will includes a codicil. By the tenth item of the codicil the testator gave certain bonds and mortgages as a fund in trust, from which the income was to be paid to the testator's children, Marion H. Stokes, Edward A. Stokes and John W. Stokes in equal shares during their lives; with the further provision that "upon the decease of any or all of my said children, then to pay the equal one-third part of said principal sum to their surviving lawful heirs."
Of the testator's said children, Marion (now Mrs. Gane) and Edward A. Stokes still survive. The other child, John W. Stokes, died July 6th, 1936. He never had any natural children, but is survived by Gertrude Stokes Harloff, whom he legally adopted as his daughter in 1915.
The issue in this cause is whether or not the latter is entitled to the one-third part of the trust fund aforesaid, to which she would admittedly be entitled if she were the natural child of John W. Stokes. Is she, as such adopted child, the "surviving lawful heir" of John W. Stokes, deceased, under the true intent and meaning of the testamentary gift aforesaid?
It is contended in the first place, on behalf of Mrs. Harloff, that this question is already res adjudicata, — that it has heretofore been determined in her favor by an order or decree of *Page 391 
this court in a prior proceeding to which both she and the opposing claimants were parties. The proceeding referred to is on a petition by John W. Stokes aforesaid, for the sale of certain lands, under the provisions of the statute entitled "An act to authorize the sale of lands limited over to infants or in contingency, in cases when such sale would be beneficial," (Rev.1877, p. 1052; 3 Comp. Stat. p. 4688). The lands in question were devised, by the fourth paragraph of the same codicil hereinbefore mentioned, to the said John W. Stokes for life, and at his death to "his lawful heirs, share and share alike." The petition, in addition to setting forth the facts as to this devise, and the facts as to his adopted daughter, his brother and sister and the latter's children, and alleging that the interests "of the owners of the particular and future estates in said lands require and will be promoted by a sale of the lands in fee," contains a paragraph stating that "petitioner is entitled to a life estate in * * * said premises; Gertrude Stokes the adopted daughter of petitioner is entitled to the remainder * * * subject to be divested by her death during the lifetime of petitioner; upon which contingency the said remainder in fee would go to * * * Edward A. Stokes, brother, and Marion H. Swan, sister of petitioner," or to their heirs. The prayer of the petition is for an order that the lands be sold in fee.
The report of the master to whom the matter was referred, in addition to stating the facts as to the devise, the adopted daughter and the brother and sister of the petitioner, the character and condition of the property, and his opinion that the lands should be sold, also contains a paragraph similar to the particular paragraph in the petition as above mentioned, — that Gertrude Stokes, the adopted daughter, is entitled to the remainder after petitioner's life estate, subject to being divested by her prior decease.
The order made on this report was that the property be sold in fee. It recites (inter alia) that "it satisfactorily appears to the Chancellor that the said real estate is held and limited over as stated and set forth in the petition;" and it is contended that the order is an adjudication that Gertrude Stokes (now Harloff) is entitled to the remainder and is *Page 392 
binding on the other defendants herein because they were brought in by notice in that prior proceeding.
It is deemed that this contention cannot be sustained. In the first place the decree does not decree that Gertrude Stokes is entitled to the remainder in the real estate in question, — it decrees only that the lands be sold. It is true that the decree recites a finding by the court that the real estate "is held and limited over as stated and set forth in the petition;" but this is not to be construed as a finding that the real estate is held by John W. Stokes for life with remainder in Gertrude Stokes at his death, — because although paragraph 4 of the petition alleges that this latter is so, such allegation is merely a conclusion of law drawn by the petitioner as his opinion from the facts. The preceding portion of the petition set forth the facts, — i.e., the provisions of the will and the circumstances as to the beneficiaries referred to in the will, — which show that the situation of this real estate was such as to come within the scope of the provisions of the statute, namely that there was a future or contingent interest therein "limited over to infants or persons not in esse or in such manner that the vesting or duration of such estate may be contingent." The decree ought not to be interpreted as adjudicating anything other or beyond this latter; — for several reasons.
First, — no broader or more extensive adjudication was necessary or material; hence no broader interpretation is natural or probable. All that was necessary for the court to find and adjudicate in this behalf was that there was a future or contingent interest in the lands, limited over to infants, or persons not in esse, or to contingent beneficiaries.
Second, — a decree adjudicating the rights of the claimants to the future or contingent interests as between themselves, — if it had been expressly made, — would have been outside and beyond the issues comprised in the pleadings. The petition prays simply for an order that the lands be sold, — not for an adjudication as to the rights of the possible claimants as between themselves. A judgment that goes beyond the issues before the court is, — to that extent, — void. Jones v. Davenport, 45 N.J. Eq. 77,17 Atl. Rep. 570; Nagle v. Conard, 96 N.J. Eq. 61,125 Atl. Rep. 20. Obviously, unless there be *Page 393 
no other interpretation possible, no decree should be interpreted in such manner as to make it void.
Third, — the order or decree, if it expressly adjudicated that which it is contended it should be construed as adjudicating, — i.e., the right of the claimant to the remainder interest in the lands, — would not be binding on any of the claimants, because none of them had any opportunity to be heard on that issue. None of them were brought into court by process. Notice of the proposed filing of the petition, together with a copy of the petition, was served on each; but, as already noted, the petition prayed only a decree that the lands be sold, and there was no intimation that any decree would be sought determining the ownership of the remainder interest. None of the claimants in fact appeared. Such nonappearance may very well have formed a basis for the entry of the decree for sale, on the theory that it showed acquiescence or consent to a decree for sale if the requisite proofs were adduced by the petitioner; but it could form no basis for a conclusion that they were willing to have a decree entered establishing the ownership of the remainder interest.
Fourth, — a decree cannot be res adjudicata unless the subject-matter of the two suits is the same. Such is not the fact in the instant case. In the prior proceeding, the subject-matter was. — if we accept the theory of Mrs. Harloff, — the ownership of a remainder interest in certain lands; in the present suit, it is the ownership of a remainder interest in certain personal property; and the two were respectively comprised in two separate gifts in the will.
The main issue therefore has not been heretofore determined. — either by the application of the rule of res adjudicata nor the doctrine of stare decisis; and we return to its consideration.
Obviously it is necessary in the first instance to determine what class of persons was meant by the testator under his designation "the surviving lawful heirs" of John W. Stokes, before it can be determined what particular individuals have become entitled to the gift. *Page 394 
In a number of cases where a testator has used the words "heirs" or "legal heirs" or "lawful heirs" to designate the recipients of gifts of personalty, — or of realty, — it has been held that because of other language or provisions in the will plus certain attendant circumstances, the testator must have used the words as meaning "children," — or in some cases, "issue." It is the contention of the complainant and of the defendants other than Mrs. Harloff, that such is the case here.
Under the established law of this state, however, such is not the usual presumption. It is definitely settled that where the gift is of personalty, as here, the testator is deemed to have meant by the words "lawful heirs," those persons who would take under the statute of distribution, — unless there be evidence sufficient to indicate a different intention. Traverso v.Traverso, 99 N.J. Eq. 514, 133 Atl. Rep. 705; aff'd, sub nom.
[*]Traverso v. McMillin, 101 N.J. Eq. 308, 137 Atl. Rep. 919;White v. Willever, 112 N.J. Eq. 546, 165 Atl. Rep. 863; aff'dsub nom. [*]In re White, 118 N.J. Eq. 70, 176 Atl. Rep. 322;Apgar v. Hoffman, 113 N.J. Eq. 233, 166 Atl. Rep. 159; aff'dsub nom. Hoffman v. Apgar, [*]115 N.J. Eq. 171,169 Atl. Rep. 690.
Of course if there be evidence sufficiently indicating a different intention by testator, that will prevail. The primary rule is to give effect to testator's intention. We must therefore consider the entire will and the surrounding circumstances in the endeavor to ascertain what, if any indications there are that testator's intention was different from that which is embodied in the primary presumption established by the law as above mentioned.
The will itself was executed in February, 1870, when the testator was in the neighborhood of forty-five years of age, and had four children, — the eldest of whom (Joseph) was at that time between eight and nine years of age, and the youngest (John) was only one year old. Although it contains a considerable amount of the phraseology of wills drafted by members of the legal profession, it is quite obvious that it was not in fact drafted by a lawyer, — vide, for instance, the phrase "Should she not live to heir it" (referring to a money bequest). *Page 395 
which no lawyer would have used no matter how little his skill or experience; also the use of the word "bequeath" in gifts of realty.
Reference to the original will shows that it is in the testator's own handwriting; and in all probability it was drafted by the testator himself, utilizing such testamentary knowledge or phrasing as he had obtained from some form book or possibly earlier wills drafted by scriveners of more or less skill and experience. (That there had been at least one prior will, is definitely indicated by the fact that this will commences with gifts to his wife, which are then followed by gifts to each of his first three children, then follow gifts to his eight brothers and sisters and some other persons, and almost at the end of the will, after some general provisions, there is a gift to his youngest child. Obviously this will, made one year after the birth of that child, followed, — generally speaking, — the provisions of a former will, with some additions and changes). In any event, the evidence indicates that the will was drafted not by a lawyer but by testator himself.
There is no instance in the will itself where the testator uses the words "surviving lawful heirs." There are however six instances where he uses the words "lawful heirs," and one where he says "natural heirs."
Testator's gifts, as set forth in the will, are as follows:
Item 1. His household goods, books and furniture to his wife;
Item 2. His residence to his wife for life, then to his oldest child Joseph for life, remainder to the "children" of Joseph;
Item 3. A parcel of real estate in Philadelphia to his wife for life, then to his daughter for life, remainder to her "children."
Item 4. A parcel of real estate to his son Edward, if he survive testator, for life, remainder to Edward's "lawful heirs."
Item 5. Two devises to his brother Louis for life, contingent on his surviving testator, remainder to Louis' "children," with provision that if Louis predecease, both properties be sold and the proceeds divided among Louis' "children." *Page 396 
 Item 6. A contingent devise to his brother Israel for life, remainder to Israel's "children," with provision for sale and distribution to Israel's "children" if Israel predecease.
Item 7. A devise to his brother Samuel for life, and at his death the property to be sold and the proceeds divided among Samuel's "lawful heirs."
 Item 8. A contingent devise of three properties to his brother Benjamin for life, — with no provision as to the remainder, but a provision that if Benjamin predecease testator the properties shall be sold and the proceeds divided among Benjamin's "lawful heirs."
 Item 9. A bequest of $2,000 to his sister Judith, or if she predecease testator, then to her son Samuel.
Item 10. A devise to his sister Rebecca for life and at her death the property to be sold and the proceeds divided among her"natural heirs."
 Item 11. A devise to his sister Lydia for life, with sale at her death and division of the proceeds among her "lawfulheirs."
 Item 12. A contingent devise to his sister Margaret for life, remainder to her "children," with provision for sale and distribution to her "children" if she predecease.
Item 13. A contingent devise to his nephew Edward King for life, remainder to Edward's "lawful heirs," but no provision for the event of Edward predeceasing testator.
Item 14. A gift of $500 to Edmund Moses (son of a niece).
Item 15. A gift of all his stocks, to testator's wife.
Item 16. A gift to his wife of all the "residue of my estate not otherwise mentioned in this will."
Item 17. A power of sale to his executors, as to undevised real estate.
Item 18. An ad terrorem clause.
Item 19. A contingent devise to his son John, for life, remainder to John's "lawful heirs," but no provision for the event of John predeceasing testator.
Item 20. A further devise to his sister Rebecca for life, remainder to her son Benjamin. *Page 397 
It will be observed that in all of the six instances of the use of the term "lawful heirs," it is used to designate the recipients of a remainder interest after a life estate in realty; in one instance the term "natural heirs" is similarly used; and in nine instances the word "children" is similarly used.
The codicil was executed in 1881, some ten years after the death of his oldest child Joseph, (who had died at the age of nine years) and at a time when his three remaining children were respectively seventeen, fifteen and twelve years of age, — all unmarried and of course without children. His wife was still living. It also is in testator's own handwriting; it consists of some eight pages; and from its phraseology would appear to have been drafted by a competent lawyer, — except possibly for the paragraph containing the gift which is the subject-matter of this suit, and which will be later herein considered.
It mentions the death of his son Joseph and devises the remainder interest in the residence to the Union Industrial Home for Destitute Children, with a reverter clause to testator's "lawful heirs then surviving." It makes a bequest of two mortgages to Ellen Moses for her life with remainder to her "lawful heirs." Then follows a devise of real estate to his daughter Marion for life, remainder to her "lawful heirs;" a devise to his son John for life, remainder to John's "lawful heirs;" another devise to his daughter for life, remainder to her "lawful heirs;" a devise to his son Edward for life, remainder to Edward's "lawful heirs;" another devise to his son John for life, remainder to John's "lawful heirs;" another devise to his son Edward for life, remainder to Edward's "lawful heirs;" another devise to his son John for life, remainder to John's "lawful heirs;" and the clause in question in this suit; together with a few other provisions not here of any materiality.
It will be observed that each of the seven devises in the codicil is to one of testator's children, for life; that in each instance the remainder is given to the life tenant's "lawful heirs." — in no instance is the word "children" used; and in the two instances of bequests of personalty for life, — one of which is to a niece and the other to testator's three children, — the remainder is given to the "lawful heirs" of the life tenant. *Page 398 
What did the testator mean by his use of the term "lawful heirs" in these devises of real estate?
Considering the will and the codicil, and all of their provisions, the circumstances at the time each was executed, and the differences and similarities, — what, if any, additional light can be gained therefrom as to what testator meant by the words "surviving lawful heirs" in the tenth paragraph of the codicil?
In the will, — there are four devises of life estates in realty to testator's children, i.e., to
1. Joseph, — remainder to his children.
2. Marion, — remainder to her children.
3. Edward, — remainder to his lawful heirs.
4. John, — remainder to his lawful heirs.
None of these had children at the time of the will; all were infants below the age of ten.
There are also life estates in realty devised to testator's four brothers, i.e.,
1. To Louis, — remainder to his children.
2. To Israel, — remainder to his children.
3. To Samuel, — remainder between his lawful heirs (proceeds of sale).
4. To Benjamin (contingent), — substitutionary gift between hislawful heirs (proceeds of sale).
All of these brothers were living, and had children living, at the execution of the will and at the execution of the codicil.
There are four life estates in realty devised to sisters,i.e.,
1. To Rebecca, — remainder between her natural heirs
(proceeds of sale)
2. Rebecca, — remainder to her son Benjamin.
3. Lydia, — remainder between her lawful heirs (proceeds of sale)
4. Margaret, — remainder to her children.
Judith, another sister, has a contingent $2,000 bequest, — substitutionary legatee, her son Samuel.
Edward King, a nephew, was given a life estate in realty, remainder to his lawful heirs.
All of these were living, and had children living, at date of will and of codicil. *Page 399 
 In the codicil there are seven devises of life estates in realty, each to one of testator's sons or daughter, each with remainder to the life tenant's lawful heirs. There is also a gift of realty with reverter on condition broken, to "my lawfulheirs then surviving;" a gift of personalty to a niece for life, remainder to lawful heirs; and the personalty gift here in question, — income for life to testator's three children, principal to their surviving lawful heirs. The three children were all infants under eighteen years; none was married.
In the will, then, of the four life estates in realty to testator's children, two of the remainders are to "children" and two to "lawful heirs;" of the four similar gifts to his brothers, two have remainders to "children" and two to "lawful heirs;" of the four similar gifts to his sisters, one has remainder to a named son, one to "natural heirs," one to "lawful heirs" and one to "children;" there is a contingent gift of personalty to a sister, with substitution of a named son; and a gift of realty for life to a nephew, remainder to "lawful heirs." In the codicil the nine remainders and the reverter are all to "lawful heirs," — none are to "children."
The fact that in the will some of the remainders are to "children" and others to "lawful heirs" naturally and ordinarily imports a distinction and differentiation; that testator did not mean by "lawful heirs" the same thing that he meant by "children." There can be no doubt as to what he meant by "children," (except perhaps doubt as to whether he meant to include grandchildren); and there is nothing to cast doubt on the natural inference that by "lawful heirs" he meant something different from "children." On the contrary there are several indications strongly corroborative of that natural inference.
One of these is the fact that in some instances he specified named persons as remaindermen; indicating that in each and all of his gifts of remainders he was exercising a reasoned choice and differentiation. Another is the fact that as to the first gift of his residence or Mansion House, (which he leaves in remainder to his son Joseph's "children"), he says it is his wish that the property "shall remain in the family." It is a reasonable or fair inference or possibility that the Philadelphia *Page 400 
property (which he leaves in remainder to his daughter Marion's "children"), was likewise also a family residence or property. He gives both of them first to his wife for her life. Still a third is the fact that in the codicil all the remainders (after life estates, all but one of which are to his children) are to their "lawful heirs," and none of them to "children," yet he makes no change in the language of the remainders in the will, but on the contrary ratifies and confirms those gifts as they stand, although obviously he must have gone over the will carefully in determining upon the changes which he did make by the codicil, and (as will be remembered) it seems clear from the language of the codicil, that (for the most part) it was drafted by a competent lawyer. This indicates very strongly that he still wished to limit the remaindermen to "children" in those instances in which he had done so; and that he therefore had had a particular reason and differentiation in mind, — and still had.
There is still another very strong item of proof that in the remainders to "children" testator meant "children" and in the remainders to "lawful heirs" he did not mean "children" but meant something different from children strictly as such. In the four devises to his brothers, the remainders as to two of these items are given to their children and these remainders are of the realty itself. The remainders as to the other two items are given to the "lawful heirs," and as to both of these items those remainders are not in the realty itself, but in the proceeds of sale thereof, (the realty being directed to be sold at the death of the life tenants). Similarly, in the four devises to his sisters, — in the remainder to the "children" and in the remainder to the specifically named nephew, both of these remainders are in the realty itself, whereas in the other two remainders, which are given to the "heirs," the remainders are not in the realty itself, but in the proceeds of sale thereof.
The natural and inevitable conclusion from all this is that in those instances where he gave the remainders to the "children," he clearly desired and intended (for some reasons of his own, whatever they may have been) that those remainders should go to the actual children, if any, of the respective life *Page 401 
tenants, — the actual descendants, (just as, in the remainders or substitutions to specifically named persons, he desired and intended them to go to the specific persons named); but in the instances where he gave the remainders to the "lawful heirs" he was not concerned that the realty itself should pass, and was not concerned with any particular specification or limitation as to the remaindermen, but was satisfied that those remainders should go to those persons to whom the law would give the property involved in those remainders if the life tenants had owned such properties and died intestate with regard thereto.
The conclusions derived from consideration of the will are further corroborated by consideration of the codicil. There is nothing to indicate that he had any sentimental or other particular interest in any of the properties comprised in the seven devises to his children in the codicil, which would lead him to have any concern as to what particular persons they should pass to on the death of the children. Rather the contrary, — some of them were purchased at sheriff's sales. He was therefore concerned only with dividing them up among his children so that they would have the benefit and income for life, and was satisfied that these properties should pass, on the deaths of his children, to those who should be by law their intestate successors.
The fact that the language used as to each of the remainders in the codicil is that the property shall "descend" to the "lawful heirs" of the life tenants assuredly is no indication that he meant "children." Eight of those life estates were to his own children, none of whom then had children, all being still infants; and he had prominently in mind that one or more of them might never have children, — might never have any "descendants"
as "lawful heirs," — because he speaks of the death of his son Joseph, (who had died at the age of nine just a year after the prior will had been executed). It is evident, therefore, that when he said "lawful heirs" in the codicil he could not have meant "children;" that when he says "descend to his lawful heirs" he is using legal phraseology, — the same language that is used in section 2 of the Descent act in providing that property shall "descend" to *Page 402 
brothers and sisters of an intestate. And on the other hand, since he did not change "children" to "lawful heirs," in the will, it is evident that he still meant "children" in the places where he had used that word in the will, — and that he had a very real and actual distinction and differentiation in his mind and intent.
It is concluded then from consideration of the entire will and codicil and the attendant circumstances, that by the words "lawful heirs" in the devises of realty in the will and codicil, testator meant the intestate successors under the statute of descent. By the established law of this state, that is the interpretation to be accorded to those words, in the absence of clear indication to the contrary. Edwards v. Stults, 97 N.J. Eq. 44,
and cases cited at p. 46; White v. Willever, 112 N.J. Eq. 546,
at 548; aff'd *118 N.J. Eq. 70. In the instant case not only is there no indication to the contrary, but instead the indications are all corroborative.
This being so, the natural inference is that in the use of the words "lawful heirs" in the gifts of personalty in the will and codicil, testator meant either the same thing, — intestate successors of realty under the statute of descent, or intestate successors of personalty under the statute of distributions. There is nothing in the will or codicil or attendant circumstances to indicate that he meant the former rather than the latter; hence under the law as established in the Traverso,White, and Apgar cases cited earlier herein, it is to be deemed that he meant the latter, — the successors under the statute of distribution.
It may be noted that in the instant case it would in fact be immaterial, on this point, whether testator intended successors under the statute of descent, or successors under the statute of distribution. The defendant Gertrude Harloff, if a natural born child of John W. Stokes, would take the remainder under either designation. John W. Stokes never had any other child, and left no wife surviving him.
It should further be noted that in the instant case there is no opportunity for the operation of the Rule in Shelley's Case, — (which is a rule of law, not of interpretation); because clearly the testator used and intended the words "lawful heirs" *Page 403 
not as words of limitation, but as words of designation. This is evident because the gifts are to the "lawful heirs share andshare alike." Shugre v. Long, *82 N.J. Law 717.
Neither is there any operation of the old tenth section of the Descent act, — 2 Comp. Stat. N.J. p. 1921. That section applied only to such cases as would have been controlled, at common law, by the Rule in Shelley's Case. Shugre v. Long, supra, at p.725.
(The Rule in Shelley's Case was entirely abrogated and the tenth section of the Descent act was repealed, by P.L. 1934, c.204, p. 288; — now found in R.S. 46:3-14; but of course that legislation had no application or effect on the operation of the will here sub judice, which was probated March 12th, 1900.)
The particular gift which is here under consideration is of a fund of personalty in trust to a trustee, to pay the income to testator's three named children in equal shares "during the term of their natural lives; and upon the decease of any or all of my said children then to pay the equal one-third part of said principal sum to their surviving lawful heirs." The language of this provision assuredly is not professionally artistic, and affords ground for the conclusion earlier mentioned herein, that while the codicil for the most part would seem to have been drafted by a lawyer, nevertheless such draft must have been modified, or added to, by testator himself, before he wrote or copied it off for execution, — and especially as to this provision. This would make no difference in the interpretation of the words "lawful heirs," for those words are similarly used some seven or eight times in other provisions of the codicil.
In this particular provision the phrase used is "surviving lawful heirs." The word "surviving" is presumably testator's own interpolation; a lawyer would scarcely have used it because it is so clearly meaningless surplusage. Those who are a man's heirs at his death necessarily must be then surviving; he can have no heirs who are not surviving. Testator's use of this word however is of no weight as an indication that he meant "children" by the words "lawful heirs." When this codicil was executed there were no children of his children, *Page 404 
to require him to differentiate between their children then living and such children as might survive them. It is simply surplusage, — an error arising out of testator's lack of legal education, like the other errors in the same provision of the codicil.
This provision, according to the strict meaning of the actual language used, would entitle testator's children to income only during the period of their joint lives, and would require the trustee, upon the death of any one of testator's children, — upon the death of the first of them to die, — to make a payment of principal, but only the one-third part of the total principal, to the surviving heirs of all three children (notwithstanding two of those children were still living and hence had not and could not have any "surviving heirs"). There is no doubt of course that this is not what testator intended; there is no doubt, — and as to this all parties are agreed, — that what testator did mean by this was that the trust fund should be considered as composed of three equal undivided parts (from which respectively the three children were each respectively to receive the income), and that on the death of each child, his or her respective "heirs" should receive the respective share of principal from which the ancestor so dying had enjoyed the income; and that each of testator's children should enjoy the income from the original one-third share, until his or her death, irrespective of the prior death of either or both of the other two children.
It is determined, then, that the will means that at the death of each child one-third of the original principal of the trust fund is to be paid to the "surviving lawful heirs" of that child; that the meaning of the words "surviving lawful heirs," as used by testator, is the same as if he had said "those entitled to take by intestate succession under the statute of distribution." It is further obvious that the identity of those persons who would be entitled to take personal property of a decedent by intestate succession at his death, must be, — can only be, — determined at the death of such decedent and under and in accordance with the statute of distribution in force at suchdeath, in the state in which such decedent was domiciled at thetime of his death. *Page 405 
Paraphrasing the will accordingly, the provision would read, —
Upon the death of any one of my said children, one-third of the original principal of the trust fund shall be paid to such person or persons (and if more than one, then in equal shares) as shall at that time be entitled to take by intestate succession the personal property of the said child so dying, under the provisions of the law in that behalf then in force in the state in which the said child so dying shall be domiciled.
It does not appear, either by the pleadings or proofs, where John W. Stokes was domiciled at his death. If it was in this state, then of course the statute of this state governs; if it was in some other state, it is to be presumed that the law of that state is the same as that of this state, — there being no proof as to the law of such foreign state. Under the provisions of the statutes of this state in force at John's death, his adopted daughter Gertrude Harloff was his sole distributee; and that she was and is in fact his sole distributee is admitted, (at least tacitly) in the arguments and briefs of all the parties. This brings us to the next issue, i.e., is she, being an adopted child instead of a natural child of John, nevertheless entitled to take, as John's sole distributee, under the bequest given in testator's will to John's distributees?
Concededly Mrs. Harloff is John's sole intestate successor under the statutes of descent and of distribution as to any and all realty and personalty which he owned (and did not dispose of by will) at the time of his death: this by virtue of the provisions of section 4 of P.L. 1902, c. 92, p. 259, (under which act she was legally adopted by John W. Stokes, in 1915). But did the testator, John's father, intend to include in, or to exclude from, the class of John's statutory distributees, — the class whom he designated as "the surviving heirs at law" of his child. — persons who might come within that class by reason of, and only by reason of, the fact that they had been adopted and the further fact that by statute such adopted children were given the same rights of inheritance *Page 406 
and distribution from their adopting parents as if they had been natural born children of the adopting parents? This, again, is a question of testamentary interpretation.
The answer to this question would seem to follow naturally and practically as of course, from the determinations already made herein and the considerations on which those determinations were based.
As we have seen, testator gave the remainder in question to those who should at John's death be the persons constituting and being the persons entitled to take his personal property by intestate succession under the provisions of the law in force at that time in the state where he was then domiciled. There is no other designation, — no limitation or condition excluding any one who comes within that category from the right to take as one of the class so specified. Neither is there any implication or indication in the will or codicil that testator intended that any one should be excluded, — that there should be excluded from that class a person who in fact comes within it, but comes within it only by reason of the fact that the law as to adopted children places her within it. On the contrary such indications as there are, lead to the contrary conclusion.
As has already been pointed out, the indications from the will are that as to many of the gifts provided therein, testator had, and manifested, particular concern and interest as to the identity of the persons to whom such gifts should go in the event of the death of the first takers, but that the gifts over to "lawful heirs," — statutory distributees, — indicated conversely that he had no such concern in those instances, and that he was content that those gifts should go (after the deaths of the first takers, in whom he was concerned) to whatever persons the law, — whatever it might be at the time and place of the first takers' death, — should specify as being entitled to take in succession from the first taker.
(This latter would be even more strongly indicated if testator had provided that remainders and substitutionary gifts should go to such persons as the first taker should designate by will, or, in default of such will, to the first taker's intestate successors; and it is quite possible indeed that that is what *Page 407 
testator actually meant in and by his designation "lawful heirs" of the first taker, — that he meant those remainders or substitutionary gifts to go to those who would "inherit" from the first taker, whether by will or intestate succession. It is judicially recognized that where the provisions of a will indicate that such was actual meaning and intent of the testator, those words should, and will, be judicially interpreted in just that way, — see Scudder v. Van Arsdale, 13 N.J. Eq. 109, at113; Edwards v. Stults, 97 N.J. Eq. 44; In re Allwood,118 N.J. Eq. 172; also cases cited in 69 C.J. 212, note 43; and there is some indication in the instant case that testator may have intended them in that sense, — to wit, the language in the ninth item of the will, where he makes a bequest to his sister Judith and then says, "should she not live to heir it" then to her son Samuel: obviously he was there using the word "heir" as meaning a taking by testamentary gift.)
The testator having thus provided that this remainder should go to such persons as the law, at the time of his child's death and in the state of such child's then domicile, should constitute his son's intestate successors, it seems entirely clear that he had no concern at all as to whether or not an adopted child should or would share therein, — no concern as to who the persons might be who would take this remainder. It is obvious that he could not know in what state each of his children would be domiciled at his or her death, and he naturally knew that children often become domiciled after maturity in states other than that of their parents; it is incredible, or at least utterly beyond the probabilities, that he knew, at the time he executed the codicil, what the legal provisions in each of the several states then were, — much less could he know what they would be at the respective dates on which his children would die; even so far as concerned the law on that point in the State of New Jersey, he naturally knew that it might be changed from time to time and therefore knew that he could not know what it would be at the death of his child or even that it would be the same at the date of death of one child as at the date of death of another.
Clearly then he did not care who would ultimately receive *Page 408 
this remainder, — except only to the extent that they should be the persons designated by such law as should then be controlling, as the intestate successors of the life tenant. It may be a fair inference that he contemplated that any such law in any state would include an intestate's children, among the intestate's successors; but he could not know that there would be children, and he could not know that a husband or wife might not take as such successor. On the contrary he must have contemplated that a husband or wife might very likely take as such a successor, for at the time of execution of the codicil, the law of this state provided that a wife should take one-third or one-half. He therefore did not contemplate or intend that this remainder was to go only to persons of his own blood; and there being no such contemplation or intent, no inference can be erected thereon that he therefore contemplated that an adopted child would not or should not take.
There is nothing in the will or codicil, either express or implied, indicating any intent to exclude a spouse or an adopted child of one of testator's children, or any persons whatsoever, from the class which testator has specified as the beneficiaries of this remainder. Hence the question as to whether such adopted child will take as being one of that class must obviously depend on whether or not, under the law of the state of the first taker's domicile in force at the time of his or her death, such adopted child is or is not one of the persons designated by law to be the intestate successors to the personalty of such first taker.
Testator has given an estate for life to John and the remainder at John's death to such persons as shall then be entitled under the then existing law of John's domicile, to succeed (as intestate successors) to John's personalty. He says by his will that this property shall go, at John's death, to those persons to whom it would go if it were John's own property and he died intestate. Under the proofs, the law governing the identity of John's intestate successors is the law of New Jersey or the same as the law of New Jersey. By the law of this state in force at John's death, if he died leaving no widow but leaving one natural child, the latter would *Page 409 
be his sole distributee. Also by the law of this state, if John's child was an adopted child instead of a natural child, it would similarly be his sole distributee, — this by virtue of the provisions of the adoption statute, P.L. 1902, p. 259; 2 Comp.Stat. N.J., p. 2807, under and pursuant to the provisions of which Mrs. Harloff was adopted, in this state, by John and his wife in May, 1915. That statute provides, by section 4 thereof, that the adopted child shall have the same rights of inheritance and distribution from the adopting parent or parents as if it had been born to them in lawful wedlock.
Mrs. Harloff is therefore entitled to the legacy in dispute.
It is true that the statute last mentioned also provides that the adopted child shall not be capable of taking propertyexpressly limited to the heirs of the body of the adopting parent or parents, nor property coming from the collateralkindred of such adopting parent or parents by right of representation, — but neither of these is the situation in the instant case. The legacy here is not limited, either expressly or impliedly or in any other way, to the heirs of the body of John, — it is given to those whom the law shall constitute his intestate successors. Mrs. Harloff is the sole person whom the law constitutes his intestate successor; ergo she is the person whom the testator has designated as the beneficiary of this remainder.
The arguments adverse to the claim of Mrs. Harloff place reliance on various decisions holding that under various circumstances, — such as where at the time of the execution of the donative instrument there was no adoption act in force or the adoption had not taken place or the donor was ignorant of the adoption, — a gift to "children" or "grandchildren" will ordinarily be construed to mean natural born children or grandchildren and an adopted child will not be entitled to take.
Clearly these decisions are neither controlling, nor even material, on the issue here sub judice. All of them deal only with the interpretation of words such as "children" or "grandchildren" or "issue." By the adoption statute an adopted child is included in the class of heirs or distributees of the adopting parent, and given the same status as a natural child. *Page 410 
The effect of that statute is the same as if the descent and distribution statutes were amended by the insertion of the words "natural or adopted" after the words "child" or "children" wherever they appear therein. In re Book, 90 N.J. Eq. 549, at552. On the other hand the adoption act expressly provides in effect that an adopted child shall not constitute, or be included as, one of a class of testamentary beneficiaries designated in the will as "the heirs of the body" of a person who is an adopting parent. Obviously also an adopted child would not come within a class of testamentary beneficiaries designated as "natural born children" or "children born to X."
But the adoption statute makes no provision one way or the other, as to whether or not an adopted child shall take under a testamentary gift to a "child" or "children." Where a testamentary gift is given to a class designated as "children," it is frequently uncertain whether the testator used that word in the sense of including only natural children or in the sense of including also adopted children. There is uncertainty as to the identity of the persons constituting the class so designated. But there is no uncertainty whatever as to the persons who constitute the class of statutory distributees of X; the statute fixes them definitely. Where a testator makes a gift to the "statutory distributees of X" there is no ambiguity or uncertainty to necessitate or give opportunity for a judicial determination as to whether or not he meant to include adopted children in that class, — the statute determines that. If the statute includes adopted children among X's distributees, then the testator has included them in the class to whom he has given his gift; otherwise not. Any inquiry or consideration as to whether there was an adoption statute in effect at the execution of the will, or whether or not the testator knew that X had an adopted child, is utterly immaterial. Testator has given to those, whoever they may be, who shall happen to constitute X's statutory distributees.
Therefore decisions dealing with the question as to whether or not an adopted child is entitled to take a testamentary gift to beneficiaries designated by testator as "child" or "children," *Page 411 
— whether testator in using the word "child" or "children" used those words in that one of their two equally possible meanings which would include an adopted child or in the other meaning which would exclude such child, — have no application or materiality in a case where testator has given the gift to "statutory distributees." There has not been cited to, or found by, the court any case holding that a gift to "statutory distributees," (with no expression that some persons are to be excluded from the members of that class as fixed by the statute), is to be interpreted as excluding an adopted child (where the statute at the time and place of death includes such child in the class of intestate successors).
The determination in the instant case does not in anywise depend on the rule of construction adopted in Haver v. Herder,96 N.J. Eq. 554. In that case it was held that even in a case where testator gives to a class designated as "heirs," "lawful heirs" or "legal heirs," of a person other than himself, under circumstances such that prior to the statute of adoption those words would have been held to mean "children" or "grandchildren," he will be deemed, — in the absence ofindications to the contrary, — to have intended to include adopted children within that class. It would follow, of course, that the same rule would govern if the class of legatees was designated by the actual word "children," instead of by words meaning "children."
This rule of construction is not contradicted by Ahlemeyer v.Meyer, 102 N.J. Law 54; affirmed, 103 N.J. Law 617, nor byDulfon v. Keasbey, 111 N.J. Eq. 223, nor by Stout v. Cook,77 N.J. Eq. 153, cited on behalf of the other children of testator. The Ahlemeyer case holds that the fact that the donor was a stranger to the adoption, constituted an effective "indication to the contrary," (especially where the gift was by deed); in the Dulfon case it was held that the language of the will as a whole effectively evinced an "indication to the contrary;" and in the Stout case it was held that the fact that there was no adoption act in force at the date of execution of the will constituted an effective "indication to the contrary."
But the rule of construction adopted in Haver v. Herder has no application in the instant case, because here the testator *Page 412 
has not used the word "children," or words meaning "children;" he has used "statutory distributees," i.e., words meaning "statutory distributees." If he had used the word "children" or words meaning children, in all probability Mrs. Harloff would be excluded, under the decision in the Ahlemeyer case, — because testator was a stranger to the adoption.
Confusion tends to arise from the fact that the actual words used by testator were the same in Haver v. Herder, supra, as in the instant case, — "lawful heirs" or "legal heirs." To avoid this confusion it must be kept in mind that the words were used in utterly different meanings in the two cases; it must be kept in mind that, in legal contemplation, the words used in theHaver case were "children," and the words used in the instant case were "statutory distributees."