IN THE MATTER OF THE ESTATE OF JOHN ENGLIS, a/k/a JOHN ENGLIS, JR., DECEASED.

TRUST FOR THE BENEFIT OF BERTHA E. SAYRE.

Argued April 22, 1969—Decided June 30, 1969.

*Mr. Roger C. Ward* argued the cause for defendants-appellants Janice M. Lewis and Russell W. Melcher (*Messrs. Pitney, Hardin & Kipp,* attorneys; *Mr. Roger C. Ward* and *Mr. William H. Hyatt, Jr.,* on the brief).

*Mr. Milton Prigoff* argued the cause for defendant-respondent John E. Melcher (*Messrs. Lebson & Prigoff,* attorneys; *Mr. Milton Prigoff* and *Mr. Thomas G. Loman* on the brief).

*Messrs. O'Mara, Schumann, Davis & Hession,* attorneys for plaintiff-respondent, Trustee, Manufacturers Hanover Trust Company (*Mr. Frederic W. Schumann, Mr. Paul M. Hanlon,* and *Mr. James Dorment, Jr.,* of counsel).

The opinion of the court was delivered by

PROCTOR, J. This is a will construction case, initiated by a trustee who requests instructions concerning the proper distribution of the principal of a trust created under the will of John Englis for the benefit of his daughter, Bertha Englis Sayre, during her lifetime. The trustee's uncertainty arises from the language of the will pertaining to the devolution of the principal following Mrs. Sayre's death. Mrs. Sayre died in 1966 at the age of 95 years, widowed and without children or other issue; she had been the last surviving child of the testator.

John Englis executed his will in 1911, and republished it by codicil in 1914. He died in 1915, survived by his wife and five of his six children — Charles, Bertha, Anna, Jeanette, and Mary. His son William predeceased him by 25 years, leaving two children, William and Madelyn, who received specific bequests in the will. Paragraphs 11 and 12 of the will dispose of the residue of the estate as follows:

"ELEVENTH: All the rest, residue and remainder of my estate, both real and personal, including lapsed legacies, I divide into five equal separate parts, and I give, devise and bequeath each of said separate parts unto my Executors hereinafter named, or such of them as shall qualify, and the survivors and survivor of them, in trust nevertheless for the following uses and purposes, that is to say: I direct my said Executors, the survivors and survivor of them, to rent or invest and keep rented or invested each one of said separate one-fifth parts of said rest, residue and remainder, and during the respective lives of each one of my said five children to pay over unto each of said children, the rent, income and profits of their respective one-fifth parts of such rest, residue and remainder, and at the death of each one of my said children, I give, devise and bequeath absolutely unto, and I direct my said Executors, the survivors and survivor of them, to transfer and set over absolutely unto, the children of such deceased child, share and share alike, all of the said separate one-fifth parts of my said estate from which my child so dying is entitled to receive the rent, income and profits during life.

"TWELFTH: In the event that any of my said five children shall die without leaving any children surviving, the said one-fifth part of my said residuary estate of which the income, rents or profits said child so dying would be entitled to during life, I give, devise and bequeath absolutely unto *such of my five children as may then remain living, and the then living children of any of my said five children who may have died, such grand-child or grand-children to take the same share which their parent would have taken if living.*" (emphasis added)

The problem in this case arises from the fact that certain grandchildren of the testator (children of Bertha's sisters, Anna and Mary) predeceased Bertha leaving children who were the testator's great-grandchildren. As is set forth in the Twelfth paragraph quoted above, following the death of one of the testator's five children (Bertha in this case) without leaving any children surviving, the principal of the trust (one-fifth of the residue) is to be divided among "such of

my five children as may then remain living, and the then living children of any of my said five children who may have died, such grand-child or grand-children to take the same share which their parent would have taken if living." As mentioned above, Bertha had been the last surviving of the testator's children. When Bertha died there remained no living descendants of her brother Charles, thus eliminating that branch from consideration. There remain the three branches which descend from Bertha's sisters, Jeanette, Anna and Mary. Jeanette's only children, a son and a daughter, were alive at the time of Bertha's death, and therefore it is clear from the language of the Twelfth paragraph that they are entitled to share *per stirpes* one-third of the principal of the Bertha Sayre trust.

The controversy over the division of the remaining two-thirds of the Sayre trust concerns the two lines of the Englis family which issue from Mary and Anna. Mary had two children, Russell and John Melcher. Russell Melcher predeceased his Aunt Bertha, leaving two children, Janice Lewis and Russell W. Melcher, great-grandchildren of the testator. John Melcher survives his Aunt Bertha. Anna had three children. One of them, Warren Glover, predeceased his Aunt Bertha, leaving four children, Warren Nuessle, Gerry Rogers, Randall Makepeace Glover, and Russell Englis Glover, also great-grandchildren of the testator. Anna's other children, Frances Charrington and Thomas Glover, survive their Aunt Bertha.

If the language in the Twelfth paragraph of the will — "the then living children of any of my said five children who may have died, such grand-child or grand-children" —is read literally, then the testator's *great*-grandchildren mentioned above would be precluded from taking pursuant to the will. John Melcher would be entitled to the entire one-third interest which would have gone to his mother, Mary, had she not predeceased Bertha. Frances Charrington and Thomas Glover would be entitled to share the one-third interest which would have gone to their mother, Anna, had she not

predeceased Bertha. On the other hand, if the terms "children" and "grand-children" are read broadly to include grandchildren and great-grandchildren, respectively, then John Melcher would share the one-third interest in the distribution with the two children of his brother Russell, who predeceased Bertha. Frances Charrington and Thomas Glover would share the one-third interest in the distribution with the four children of their brother Warren, who predeceased Bertha.

The trial court interpreted the will so as to include the great-grandchildren, who would take *per stirpes* the share parent would have taken had he survived Bertha. Thus the following distribution of the principal of the Sayre trust was ordered:

"One sixth (1/6) part thereof to John E. Melcher; one twelfth (1/12) part thereof to Russell W. Melcher; one twelfth (1/12) part thereof to Janice Lewis; one sixth (1/6) part thereof to Henderson Emanuel; one sixth (1/6) part thereof to Jennett Sinclair [children of Jeanette, shares not disputed]; one ninth (1/9) part thereof to Thomas Glover; one ninth (1/9) part thereof to Frances G. Charrington; one thirty-sixth (1/36) part thereof to Warren Neussle; one thirty-sixth (1/36) part thereof to Randall Makepeace Glover; one thirty-sixth (1/36) part thereof to Gerry Rogers; and one thirty-sixth (1/36) part thereof to Russell Englis Glover."

John Melcher appealed to the Appellate Division, which reversed, holding in an unreported opinion that the will evinced a testamentary intent to restrict the ultimate distribution of the principal solely to the testator's children and grandchildren. The matter was therefore remanded to the trial court for distribution which would exclude the great-grandchildren. Russell Melcher and Janice Lewis petitioned for certification, which we granted. 53 *N. J.* 227 (1969).

█ Although ordinarily testamentary language should be given a literal application, the modern view of will construction recognizes that the literal meaning of words will be departed from whenever necessary to carry out the intent of the testator as it appears from the entire document. *Fidelity*

*Union Trust Co. v. Robert,* 36 *N. J.* 561, 574 (1962). In that case, Justice Jacobs outlined this Court's general approach:

"[I]n ascertaining the subjective intent of the testator, courts will give primary emphasis to his dominant plan and purpose as they appear from the entirety of his will when read and considered in the light of the surrounding facts and circumstances. See *Zwoyer v. Hackensack Trust Co., supra,* 61 *N. J. Super.,* at *pp.* 12, 16; *Greene v. Schmurak,* 39 *N. J. Super.* 392, 400–401 (*App. Div.* 1956) certif. denied 21 *N. J.* 469 (1956); *Shepherd v. Peratino,* 86 *U. S. App. D. C.* 395, 182 *F. 2d* 384 (*D. C. Cir.* 1950); 2 *Powell, Real Property* § 325 (1950); *Simes and Smith, supra* § 844; *cf. Busch v. Plews,* 12 *N. J.* 352, 358 (1953). So far as the situation fairly permits, courts will ascribe to the testator, 'those impulses which are common to human nature, and will construe the will so as to effectuate those impulses.' See *Greene v. Schmurak, supra,* 39 *N. J. Super.,* at *p.* 400; *cf. Murphy v. Murphy,* 118 *N. J. Eq.* 108, 112 (*Ch.* 1935), affirmed 119 *N. J. Eq.* 83 (*E. & A.* 1935); *Coyle v. Donaldson,* 91 *N. J. Eq.* 138, 140 (*E. & A.* 1919); *Bank of New York v. Black, supra,* 26 *N. J.,* at *p.* 285. In the *Black* case, this court had recent occasion to determine whether a residuary bequest by the testatrix to her daughter of 'all my estate' was intended to pass property which was not literally part of her estate but over which she had a general power of appointment. We held that it did and, in the course of his opinion for the court, Justice Wachenfeld expressed high-purpose principles which should have application in the construction of all wills. He pointed out that the goal always is the ascertainment of the testator's intent and it is not to be thwarted by unduly stressing 'the literal meaning' of his words (see 26 *N. J.,* at *p.* 284; *cf. Bottomley v. Bottomley,* 134 *N. J. Eq.* 279, 290–291 (*Ch.* 1944)); that the object is to ascertain 'the probable intent' of the testator by a 'preponderance of the evidence' and to carry it out in accordance with his wishes 'even though they be imperfectly expressed' (see 26 *N. J.,* at *p.* 286; *cf. In re Klein, supra,* 36 *N. J. Super.,* at *p.* 419); and that the court's endeavor is to put itself in the testator's position insofar as possible in the effort to accomplish what he would have done had he 'envisioned the present inquiry.' See 26 *N. J.,* at *p.* 287; *cf. Simes and Smith, supra,* § 466." *Id.* at 564–566.

With regard to specific testamentary language, a word such as "children" or "grandchildren," which ordinarily represents no more than a single generation, has been broadly construed when the testamentary plan indicates an intent to include a more remote class of beneficiaries as well.

*Haas v. Canton of Berne,* 140 *N. J. Eq.* 240, 245 (*Ch.* 1947); *Holbrook v. Greene,* 125 *N. J. Eq.* 337 (*Ch.* 1939); *Dilts v. Clayhaunce,* 70 *N. J. Eq.* 10 (*Ch.* 1906); *Dunn v. Cory,* 56 *N. J. Eq.* 507 (*Ch.* 1898); *Brokaw v. Peterson,* 15 *N. J. Eq.* 194 (*Prerog. Ct.* 1854); *Ball v. Weightman,* 273 *Pa.* 120, 116 *A.* 653 (1922). See 4 *Page on Wills,* §§ 34.19, 34.21 (1961); see also Annotation, "Word 'Child' or 'Children' in Will as Including Grandchild or Grandchildren," 14 *A. L. R.* 2d 1242 (1950).

In the present case, the conclusion which emerges from an examination of the entire testamentary plan is that the terms "children" and "grandchildren" are to be read in their broader sense, including their lineal descendants, rather than to mean literally, as the Appellate Division read them, the individual grandchildren of the testator. Thus we hold that the children of Russell Melcher and Warren Glover, the testator's grandchildren who predeceased their Aunt Bertha, are not to be disinherited. The inheritance of those children, the testator's great-grandchildren, furthers the testator's intent to benefit equally the five blood lines which issued from his surviving children.

Several factors combine to make such an interpretation inevitable. First, a stirpital distribution to grandchildren rather than a per capita distribution indicates that the testator was thinking in terms of five blood lines rather than individual grandchildren. The record shows that at least one of the testator's grandchildren was born after the death of the testator, and was therefore, of course, not known to him any better than the unborn great-grandchildren. Also, as further evidence of the testator's stirpital thinking, in paragraph sixth of the will which created a trust for the benefit of the testator's widow during her life, the remainder was given to the five children equally, or if a child was dead, then per stirpes to the children of that deceased child.

Second, in the eleventh paragraph of the will, quoted *supra,* the testator gave his five children a life interest in

the trust income only, depriving them of the power to dispose of the principal by will. He thus made certain that upon the death of a child without children or other issue (as in Bertha's case) the money would be retained by, and divided among, the remaining blood lines.

Third, had Bertha survived *all* the testator's grandchildren instead of only two of them, a literal reading of the will would force a disposition of Bertha's share by means of intestacy. This would undermine the testamentary plan to limit the two children of the testator's son William (who predeceased the testator) to their specific bequests, and would contradict the traditional presumption against intestacy. *Fidelity Union Trust Co. v. Robert, supra,* at 572. Also, had John Melcher predeceased his Aunt Bertha as did his brother Russell, leaving children, the entire bloodline of testator's daughter, Mary Melcher, would be precluded from taking under the will if it were read literally. It is unlikely that this result, following an unexpected sequence of deaths as between generations, would have been intended by the testator. See *In re Estate of Burke,* 48 *N. J.* 50, 56 (1966).

Fourth, the testator must have realized that when any one of the five trusts would terminate (in this case 52 years after the making of the will and codicil), he would probably have some great-grandchildren, and it is unlikely that he would have intended that if the parents of these great-grandchildren were dead upon the trusts' termination, the children would not take as representatives of their parents' fair share of the estate. For example, had Bertha died having borne children who predeceased her, and who left children (Bertha's grandchildren) who survived her, a literal reading of the will would disinherit her own grandchildren, an unnatural result which we believe was never intended by the testator. "Courts have inclined towards giving a liberal construction to wills in order to prevent the exclusion of the issue of a deceased child." *Brokaw v. Peterson, supra,* 15 *N. J. Eq.,* at 198. See Annotation, *supra,* 14 *A. L. R. 2d,* at 1252–54.

Fifth, in a case such as this where the testator is disposing of remainder interests which might not mature for many years in the future, employing general language without naming individuals, it is more likely than not that he was referring to lineal descendants rather than to particular individuals.

In a factual context which closely parallels the present case, the Supreme Court of Pennsylvania held that the designation of "children" of the testator's children must be read to include the testator's great-grandchildren as well. *In re Clark's Estate*, 359 *Pa.* 411, 59 *A.* *2d* 109 (1948). In that case the key provision of the will, which placed the entire estate into a trust until the death of all the testator's children, read as follows: "After the death of all my children, then my Estate shall be equally divided among their living children — per stirpes — that is, they shall take by representation of their parents respectively, and not per capita." *Id.,* 59 *A.* *2d,* at 110. As in the present case, upon the death of the testator's last surviving child, certain of the testator's grandchildren had died leaving children, the great-grandchildren of the testator, who the surviving grandchildren contended were excluded from taking under the will. Chief Justice Maxey wrote for a unanimous court in holding that the great-grandchildren were entitled to share in the distribution of the estate: "* * * Mr. Clark knew that the *corpus* of the trust fund he created would not be divided among his heirs until after the lapse of a long period of time (in fact it proved to be 69 years after the date of the will). It must also be assumed that he knew that at the time the *corpus* would be divided there would probably be not only grandchildren but also great-grandchildren and that there was at least a natural likelihood that the Clark-blooded parents of some of these great-grandchildren might not then be living.

"It is inconceivable that with all this within the testator's reasonable contemplation he ever intended (1) that in the contingency stated (and which actually came to pass) the

great-grandchildren would be denied that fair share of the Clark estate which so clearly would have been their Clark-blooded parents' share had these parents been living at the time of the termination of the trust, and (2) that the portion thus denied the great-grandchildren under a narrow construction of the terms of the will would be added to the portions of the grandchildren who were first cousins once removed of the great-grandchildren.

"No court will adopt a testamentary construction which will bring about such an unnatural and inequitable distribution of testator's property unless the language of the will unequivocally requires it. The language of this will makes no such requirement." *Id., 59 A. 2d,* at 114.

This analysis is strikingly apropos to the present case, as is Chief Justice Maxey's observation with regard to the flexible nature of the terms "children" and "grandchildren": "When Thomas Fuller in Gnomologia wrote 'We are all Adam's children', he did not mean thereby that we are Cain and Abel and when Shakespeare in Love's Labour's Lost wrote of 'our grandmother, Eve', he did not mean that he was the third generation in descent from 'the first parents,' and when in Henry VIII he used the lines:

> 'Our children's children
> Shall see this and bless heaven'

he apparently had no intention of depriving heaven of the 'blessing' of great-grandchildren." *Id.*

Our construction of John Englis's will leads us to believe that the terms "children" and "grand-children" were not employed in their literal sense, but were used with a wider significance. All indications point to an interpretation of paragraphs eleventh and twelfth so as to include the testator's great-grandchildren, the lineal descendants of the testator's five surviving children, within the general plan of the document. The judgment of the Appellate Division is therefore reversed, and the judgment of the trial court reinstated.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For affirmance*—None.