736 A.2d 540 (1999)
324 N.J. Super. 538
In the Matter of the ESTATE OF Earle HENDRICKSON, Decedent.
Superior Court of New Jersey, Chancery Division, Probate Part, Monmouth County.
Decided May 19, 1999.
*541 Turp, Coates, Essl & Driggers, P.C., Hightstown (David H. Coates, appearing), attorneys for plaintiff Fleet Bank, N.A., Trustee for the Trust created under the Last Will and Testament of Wycoff Hendrickson, deceased.
Cerrato, Dawes, Collins, Saker & Brown, Freehold (John I. Dawes, appearing), attorneys for defendants Elizabeth S. Corson, Kathryn Deacon and Marie Field Sharbaugh.
Richard O. Venino, Jr., Sea Girt, for defendants Carol Lynn Gasslein, Bonnie Joyce Weaver and Robert H. Weaver.
Ronald J. Geck, Allentown, for defendants Elizabeth A. Olson and Nancy L. Nicholson.
FISHER, P.J.Ch.
It seems unimaginable that a court, near the end of this millennium, would be asked to consider the application of the long-abolished "Rule in Shelley's Case." Yet, this anachronistic doctrinelike Banquo's Ghosthas raised its hoary head and must be addressed not as an academic puzzle but as the key to a very real and substantial property dispute.
Wycoff Hendrickson ("Wycoff") died in 1928. His will, executed eight years earlier, states in part:
I give and devise to my son Earle W. Hendrickson, my farm (known as Mulberry Hill Farm) situated near Imlaystown, in the County of Monmouth and State of New Jersey during the term of his natural life, he to have the right to occupy, possess and enjoy the same and receive the rents, issues and profits, he to pay the taxes and keep said farm up during his life time and after the decease of my said son I give and devise the said farm to such person or persons as shall be his sole heir or heirs in land in fee simple.
Verified Complaint, ¶ 2 (emphasis added). Earle Hendrickson ("Earle") died on May 31, 1997 setting in motionafter the passage of nearly 70 yearsa dispute as to whether Wycoff, by this language, conveyed to Earle a fee simple (if the Rule in Shelley's Case applies) or merely a life estate (if it does not). If the former, defendants Elizabeth A. Olson and Nancy L. Nicholson ("Earle's devisees") are entitled to the property[1] if the latter, then the property passes to those who were Earle's *542 heirs at the time of his death, namely, defendants Elizabeth S. Corson, Kathryn Deacon, Marie Field Sharbaugh, Carol Lynn Gasslein, Bonnie Joyce Weaver and Robert Weaver ("Earle's heirs").[2]
Consideration of the Rule in Shelley's Case[3] seems odd because its place in the common law was abrogated in this State in 1934. But our Legislature then declared only that the "rule of the common law, know as the Rule in Shelley's Case, shall not be applicable to any interest in property created by any instrument to take effect hereafter." N.J.S.A. 46:3-14. Because Wycoff's will was probated in 1928, it remains unaffected by N.J.S.A. 46:3-14. See, Trenton Trust Company v. Gane, 125 N.J.Eq. 389, 403, 6 A.2d 112 (Ch.1939), aff'd 126 N.J.Eq. 273, 8 A.2d 708 (E. & A.1939). Legislation prior to 1934 also deprived the Rule in Shelley's Case of some of its ancient vitality. In 1846, our Legislature declared its application barred when the life tenant died with surviving lineal descendants. Since Earle died without children, this legislatively-created exception to the Rule in Shelley's Case does not attach to the present circumstances. Thus the potential exists for the application of the Rule in Shelley's Case to Wycoff's will notwithstanding these legislative events.
However, before turning to the problem which has haunted generations of law students, the court must consider the argument of Earle's heirs that the issue has been precluded by prior litigation. In 1955, Earle commenced an action in the Chancery Division against a tenant on the farm.[4] After a trial, then Judge (later Justice) Schettino determined that "[t]he interests of the owners of the particular future estates in said lands and premises require, and will be promoted by a sale thereof, and the prospective value thereof is such that it would be to the interest of the particular future estates, and to the interest of any person who might own the same in fee to sell the same." A judgment was entered on November 8, 1956 compelling the sale of the farm and the placing of the profits in trust. Earle's heirs claim the judicially-compelled sale of the farm was tantamount to a holding that Earle only possessed a life estate and not a fee simple as the Rule in Shelley's Case would, if applicable, suggest. In essence they argue the opportunity was previously presented in the 1955 action for a ruling on the applicability of the Rule in Shelley's Case and, because of that opportunity, the issue should now be deemed precluded. They are mistaken.
An issue will be viewed as having been precluded by prior litigation only when the issue was "actually litigated and determined." Hernandez v. Region Nine Housing Corp., 146 N.J. 645, 659, 684 A.2d 1385 (1996). It appears from a reading of the findings of fact and the judgment of Judge Schettino that the present issue was not resolvedbut preservedfor future litigation. While it is true Judge Schettino then found the farm to be "held by [Earle] as life tenant," this conclusion was also expressly made "subject to the limitations of" Wycoff's Will. It is true the judgment commanded that "the sale of [the farm] as herein directed shall vest in a grantee a title free and clear of any limitations and *543 conditions as set forth in" Wycoff's Will. This conclusion, however, was reached so the purchaser of the farm could take title free and clear of any limitations on the conveyance Wycoff made to Earle and not to limit the rights of unknown future claimants. Notwithstanding those provisions, the proceeds of the sale of the farm were expressly ordered to be held in trust subject to the limitations in Wycoff's Will; in other words, whether the Rule in Shelley's Case applied was left to another day. That is the only fair reading to be given to the 1956 judgment. Indeed, Judge Schettino's findings of fact and conclusions of law make no mention of the Rule in Shelley's Case, let alone a determination that it did not apply to Wycoff's conveyance to Earle. It is abundantly clear that the court wisely left the present issue unresolved until such time as Earle's devisees, who were neither known nor represented in the 1955 litigation, could be heard on the question. It would be both unfair and inappropriate for this court to preclude Earle's devisees from an adjudication on that particular issue.[5]
The Rule in Shelley's Case provides that "where an instrument gave a man a freehold and, by the same instrument, the remainder was given to his `heirs,' the first taker had a fee simple if the remainder was to his heirs generally, and a fee tail if the remainder was to the heirs of his body." 4 Bowe-Parker, Page on Wills (1961), § 37.15 at p. 617; see also, the definitions contained in N.J.S.A. 46:3-14; Peer v. Hennion, 77 N.J.L. 693, 76 A. 1084 (E. & A.1909); Lippincott v. Davis, 59 N.J.L. 241, 28 A. 587 (E. & A.1896); Mazzola v. Malley, 5 N.J.Super. 562, 68 A.2d 655 (Ch.Div.1949). Here, the practical effect of the application or avoidance of the Rule in Shelley's Case can be summarized as follows: should the trust funds from the sale of the farm pass to the devisees in Earle's Will or to the persons who ended up being Earle's heirs? That is, did Wycoff's Will transfer to Earle a fee simple, which he could freely devise by way of his own Will, or did Wycoff merely devise a life estate which terminated upon Earle's death and would thereafter pass to certain persons, described as being Earle's heirs, by way of Wycoff's Will? Because Earle's devisees and his heirs are not the same persons, the application or avoidance of the Rule in Shelley's Case controls the disposition of the property.
The Rule in Shelley's Case is not only an anachronismwhat one commentator referred to as "`exhibit A' in the museum of legal antiques," I American Law of Property (1952), § 4.40 at p. 479 but a doctrine which runs contrary to all modern thought on the interpretation of wills.[6] It unabashedly causes a transfer of an interest in property greater than what may have been the actual or probable intent of the testator. See, Page on Wills, supra, § 37.15 at 618 (the intention of the conveyor is "ignored"); American Law of Property, supra, § 4.40 at p. 480 ("in nearly all instances of its application, it defeats the intent of the conveyor"); Lippincott, supra, 59 N.J.L. at 244, 28 A. 587 ("the intention of the testator ... is of no account whatsoever"); Martling v. Martling, 55 N.J.Eq. 771, 782, 39 A. 203 (E. &
*544 A.1896) (once found applicable, the Rule in Shelley's Case "cannot be controlled by any expression of a contrary intent"). Now, the overarching goal of current probate law is the application of the probable intent of the testator. See, In re Englis' Estate, 54 N.J. 350, 355, 255 A.2d 242 (1969) ("the modern view of will construction recognizes that the literal meaning of words will be departed from whenever necessary to carry out the intent of the testator as it appears from the entire document"); Danelczyk v. Tynek, 260 N.J.Super. 426, 428, 616 A.2d 1311 (App.Div.1992) ("the judicial function in construing a will is to ascertain and give effect to the probable intention of the testator"); In re Klein's Estate, 36 N.J.Super. 407, 408, 116 A.2d 53 (App.Div.1955) ("Will the court execute the clear intent of the testator which is not fully or definitely expressed in the will, or will it, by a strict technical adherence to the form of words and their literal meaning, or the absence thereof, suffer the discernible intention of the testator to be defeated?"). Examination of the Rule in Shelley's Case and its impact in 1999, thus, adds this further burden. It requires the court to inspect the parties' dispute not in the light of present day doctrine but in the shadows cast by the law existing in the 1920s.
As mentioned, in 1920, when Wycoff's Will was executed, and in 1928, when it was probated, the Rule in Shelley's Case was part of our common law. Considering its emergence from the mist of feudal England, it seems strange that the Rule in Shelley's Case would ever be followed in this country. But with our adoption of English common law, along came the Rule in Shelley's Casea rule possessing no salutary purpose, surviving through the march of centuries only because of tradition and legislative inertia. Having no mission but to ensnare the unwary, it is hardly imaginable that a seasoned attorney in 1920 would have chosen words to intentionally invite application of the Rule in Shelley's Case.
A conveyance of a life estate with the remainder to the life tenant's heirs undoubtedly presupposes an intent to keep the property in the family after the death of the life tenant. It does not presuppose an intent to convey a fee simple; that could have been accomplished in this case, for example, by Wycoff simply saying "I give to Earle my farm" without the convoluted language quoted earlier. There can be no question, and the parties do not dispute, that Wycoff intended to give Earle only a life estate in the farm. But the Rule in Shelley's Case was designed to avoid the testator's intention to create both a life estate and a remainder interest in the life tenant's heirs by transforming the life tenant's interest into a fee simple. The challenge faced by the scrivener of a Will, during the reign of the Rule in Shelley's Case, was to capture the testator's desire to ensure the retention of the property in the family without tripping over the Rule in Shelley's Case. Scanning the landscape of New Jersey's common law at that time, Wycoff's attorney would have been confronted with a number of decisions of the State's highest court on the subject.
In 1896, the Court of Errors and Appeals found the Rule in Shelley's Case to attach to a devise to A for life, and "afterwards to descend unencumbered to his lawful heirs." As had been the understanding for centuries before, the Court described the rule as "one of law and not of construction," and disregarded the intention of the testator as being "of no account whatsoever." Lippincott, supra, 59 N.J.L. at 243-244, 28 A. 587. Decided that same year, to the same effect, was Martling v. Martling, 55 N.J.Eq. 771, 39 A. 203 (E. & A.1896); similar decisions of this era can also be found. See, Armour v. Murray, 74 N.J.L. 351, 68 A. 164 (Sup.Ct.1907); In re Forman, 104 N.J.Eq. 403, 145 A. 867 (Prerog.Ct.1929); Woodbridge v. Jarrard, 101 N.J.Eq. 439, 138 A. 536 (Ch.1927); Neill v. Petry, 96 N.J.Eq. 478, 126 A. 608 (Ch.1924). However, the last decision *545 of the Court of Errors and Appeals on the subjectprior to the creation of Wycoff's Willwas Peer v. Hennion, supra, 77 N.J.L. 693, 76 A. 1084, where the Court found a particular choice of words to have successfully avoided application of the Rule in Shelley's Case.
An undiscerning eye might view as enigmatic the decisional law of this State at the time Wycoff's Will was drafted, executed and probated. But there is, contrary to the argument of Earle's devisees, a difference between the language which Lippincott and the others found to have caused the invocation of the Rule in Shelley's Case and the language which Peer found to have avoided it. For example, like the words examined in Lippincott mentioned above, the court in Neill considered a devise to A "and to go to his heirs at his death," 96 N.J.Eq. at 479, 126 A. 608, and in Forman, the conveyance was to A "for and during his natural life, and at his death to his heirs forever," 104 N.J.Eq. at 404, 145 A. 867. The language of the conveyances considered in Martling, Armour and Woodbridge is similar. A conveyance to "A for life and at his death to his heirs," so those courts said, compelled the application of the Rule in Shelley's Case notwithstanding the conveyor's contrary intent. But in Peer, the Court of Errors and Appeals found the doctrine did not attach to a slightly different provision, namely: to A "for and during her natural life, and after her decease I do give and devise to such person or persons as shall be her heir or heirs of land." 77 N.J.L. at 694-695, 76 A. 1084. In short, the difference between the decisions of the Court of Errors and Appeals in Lippincott and Martling, on the one hand, and Peer, on the other, can be summarized very simply. The conveyances in the former cases gave the remainder, after the life estate, to the life tenant's "heirs"; in Peer, the remainder was given to "such person or persons as shall be [the life tenant's] heir or heirs." That permitted the Court in Peer to conclude the testator was merely describing the persons to whom the remainder was conveyed and not persons to whom the property would descend. As the Court in Peer explained:
If the testator in the present case had said "after her, Catherine's, death I do give and devise the said land to her heirs," it would have unmistakably created a fee in Catherine under the rule in Shelley's case; but the devise was not to her heirs. The devise of the remainder was to certain persons to be ascertained at the time of Catherine's death....
Again, there seems to be significance in the fact that the testator, after declaring that Catherine's interest should endure during her natural life, should then employ the words: "I do give and devise the said land to such persons," & c. While, it is true, that if the devise had been to the heirs of Catherine, the employment of these words would not have been significant, yet, used as they are, as a separate devise to certain designated persons, it would seem to indicate that the testator was creating a remainder by purchase.
We are of the opinion that the testator used the words "heir or heirs" as designatio personarum who should take the remainder; that those persons did not take by descent as heirs of Catherine, but by purchase from the testator; that the rule in Shelley's case does not apply, and that Catherine took an estate for life only.
77 N.J.L. at 696-697, 76 A. 1084. Peer had done it. Peeror, rather, the attorney who drafted that Willfound the words which would talismanically ward off the Rule in Shelley's Case.[7] Similarly, the Will drafted by Wycoff's attorney, and which Wycoff executed, gave the farm to Earle "during the term of his natural life," *546 and after Earle's life, gave the farm "to such person or persons as shall be his sole heir or heirs in land in fee simple" (emphasis added). Wycoff invoked Peer's words and avoided the Rule in Shelley's Case.
The argument of Earle's devisees that the Rule in Shelley's Case applies and that they are entitled to the property in question is rejected. Judgment will accordingly be entered.[8]
NOTES
[1] The farm was not possessed by Earle by the time of his death. As a result of litigation in 1955-56, discussed later in this opinion, the farm was sold and the proceeds placed in trust.
[2] A dispute between the first three and last three of these heirs discussed in their motion papers was resolved prior to oral argument.
[3] Wolfe v. Shelley, 1 Coke 93b, 76 Eng.Rep. 206 (K.B.1581). Shelley, however, is not the case which created "the Rule in Shelley's Case." As one of the leading commentators has said Shelley "rather takes the rule for granted, as well it might, for the rule has been recognized more than two hundred fifty years before as probably the law, and it had become well established in English law some two hundred years before Shelley's Case was decided." 4 Bowe-Parker, Page on Wills (1961), § 37.15 at p. 618 (footnotes and citations omitted).
[4] Earle W. Hendrickson and Katharyn N. Hendrickson, his wife, plaintiffs v. Charles S. Bullock and Unborn Heirs of Plaintiff, Earle W. Hendrickson, defendants, Docket No. C-2436-55.
[5] Earle's devisees were not parties to the 1955 action and thus cannot be precluded by the 1956 judgment. Issue preclusion cannot be invoked against a party who "could not, as a matter of law, have obtained review of the judgment in the initial action." Restatement (Second) of Judgments § 28(1) at 273, cited with approval in Hernandez, supra, 146 N.J. at 659-660, 684 A.2d 1385.
[6] The purpose behind this 600 year old doctrine is elusive. While commentators have suggested a number of reasons for its creation, the rule is generally understood to have arisen in medieval England as a means to "prevent the use of a device which would otherwise deprive the overlord of the fruits of his seignory [seigniory]." American Law of Property, supra, § 4.40 at p. 478; Page on Wills, supra, § 37.15 at p. 619. In other words, it might have been analogous to any number of provisions which a modern day scrivener might insert into a document to avoid a taxable event.
[7] In Zane v. Weintz, 65 N.J.Eq. 214, 55 A. 641 (Ch.1903) the Vice-Chancellor, in dictum, found language similar to that employed in Peer, and here, as causing the application of the Rule in Shelley's Case. While making no mention of Zane, quite clearly Peer silently overruled Zane's dictum.
[8] At oral argument, counsel for Earle's devisees represented there is available a witness who, if called, would testify that Wycoff did not intend to give anything more than a life estate to Earle. Certainly, under their view of the case, Wycoff's intent in that regard is irrelevant. To the extent, however, that this decision may be appealed and considering what the age of that witness must be, it might behoove any party who believes that testimony to have relevance to depose this witness. To the extent any party wishes to take such a precaution, an order may be submitted authorizing the taking of that deposition. See, R. 4:11-2 and 3.